**\*NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| | : | |
| HORACE BRANCH, | : | |
| | : | Civil Action No. 10-5933 (SDW) |
| Petitioner, | : | |
| | : | |
| v. | : | **OPINION** |
| | : | |
| CINDY SWEENEY, et al., | : | |
| | : | |
| Respondents. | : | |
| | : | |

**WIGENTON**, District Judge:

Presently before the Court is the petition for a writ of habeas corpus of Horace Branch
("Petitioner") brought pursuant to 28 U.S.C. § 2254 challenging his state court conviction (ECF
No. 1), on remand from the Court of Appeals for the Third Circuit for the limited purpose of
determining whether Petitioner's trial counsel's representation of Petitioner was constitutionally
ineffective.  (ECF No. 30).  Pursuant to that remand, this Court held an evidentiary hearing on
February 6, 2015.  (ECF No. 40).  At the conclusion of the hearing, counsel requested the
opportunity to provide their summations in writing.  Simultaneous submissions were filed on the
date set by this Court.  (ECF No. 45, 46).  For the reasons set forth herein, the petition is denied
and no certificate of appealability shall issue, as this Court finds that counsel was not
constitutionally ineffective.

## I.  BACKGROUND

Because both this Court's prior opinion (ECF No. 25 at 2-8) and the opinion of the Court
of Appeals for the Third Circuit (Document 2 attached to ECF No. 30 at 3-14) have discussed in

detail the factual and procedural background of Petitioner's claims, this opinion will not repeat that information here, and will instead only recount those facts which arose subsequent to this Court's previous opinion, including those presented during the February 6, 2015, evidentiary hearing.   On February 11, 2013, this Court issued an order and opinion denying Petitioner's petition for a writ of habeas corpus.   (ECF No. 25, 26).   Petitioner appealed that decision, and the Court of Appeals for the Third Circuit vacated this Court's order and remanded the matter for an evidentiary hearing.   (Document 2 attached to ECF No. 30 at 37).   In its decision, the Court of Appeals specifically found that Petitioner suffered *Strickland* prejudice from his counsel's failure to call two witnesses, Abdul Samee (also known as Reginald Currie),[1] and Stan Robinson.   (*Id.* at 33).   The matter was remanded for an evidentiary hearing and a determination of whether this prejudice was the result of constitutionally deficient performance by trial counsel sufficient to establish the deficiency prong of the *Strickland* test and would therefore merit relief.   (*Id.* at 33-37).

This Court held an evidentiary hearing limited to this issue on February 6, 2015.   Four witnesses testified at the hearing:   Petitioner's trial counsel, Johnnie Mask, for the State; as well Currie, Robinson, and Petitioner on his own behalf.   Each witness's testimony will be discussed in turn.

Petitioner's trial counsel, Johnnie Mask, was the first to testify at the evidentiary hearing. Mask testified that he had received his Juris Doctor degree in 1976.   (Hearing Transcript, Document 1 attached to ECF No. 45 at 7).   After a short stint with the New York Legal Aid

---

[1]  Because he has apparently reverted to the use of his birth name, Reginald Currie, this Court will hereafter refer to this witness as "Currie" rather than "Samee."   (*See* Hearing Transcript, Document 1 attached to ECF 45 at 91).

Society, Mask joined the New Jersey Public Defender's Hudson County office as an assistant deputy public defender in 1978.   (*Id.* at 8).   During his time with the Hudson County office, Mask handled sixty to seventy five trials, ten to twelve of which were murder trials.   (*Id.* at 9).   In late 1990, Mask was promoted to First Assistant Public Defender in Essex County, where he supervised ten to fifteen lawyers.   (*Id.* at 8-9).   Mask also testified that, as a supervisor, he handled primarily homicide cases, and it was for that reason that he was assigned Petitioner's case in 1993.   (*Id.* at 10).   As of the time of the assignment, Mask had handled twenty to twenty five murder trials, and between seventy five and one hundred criminal trials total.[2]   (*Id.* at 11).   Mask further testified that, after the Branch trial, he went on to provide the defense in a capital homicide case involving numerous county prosecutors' offices, and was ultimately named Deputy Public Defender for Somerset County in 2003, where he remained until his retirement in 2011.   (*Id.* at 12-13).

Mask's testimony then turned to his representation of Petitioner.   Mask testified that he had met with Petitioner on multiple occasions.   Mask also testified as to the process by which he located the witnesses he called on Petitioner's behalf at trial, stating that "someone provided their names and what they might offer in his defense.   I would have talked to them and deemed them to have information that a jury might be interested in and that would help our defense.   And after talking to them or having an investigator talk to them, get a report, I'll call them as a witness." (*Id.* at 16).   Mask also clarified that he would always interview potential witnesses before calling them, and provide the State with any reports which arose from those interviews as required by the

---

[2] The transcript of the hearing indicates that Mask stated that he had handled "Seventy-five hundred" trials, however it is clear from context and Mack's clarification later in his testimony that this should be read as "Seventy five, [to a] hundred."   (*Id.* at 12, 41).

3

discovery rules.   (*Id.*).   He then went on to explain that although he would consider a potential witness's criminal history in deciding whether to call a witness, that fact would not be the single deciding factor in that decision.   (*Id.* at 17, 23).   Mask also stated that as he did not have access to criminal background checks, he had been required to rely on witnesses themselves to establish what criminal history, if any, they had.   (*Id.* at 17).   As to identifying what individuals could be potential witnesses, Mask testified that he relied either on information contained in police reports, or on the suggestions of his clients.   (*Id.* at 18).   If an individual's name was not in the police reports, Mask would rely on his client to bring to him the names and addresses of individuals who might be able to provide useful testimony.   (*Id.* at 18-19).

The State then questioned Mask regarding the affidavit of Stan Robinson.   Mask identified the document as one that he had received prior to testifying at the February 6, 2015, hearing, but that he had "no recollection" of ever seeing the document before being provided it by the State in advance of that hearing.[3]   (*Id.* 20).   Mask likewise testified, upon being given a picture of Robinson, that he had no recollection of ever meeting that individual before.   (*Id.* at 22).   In addition to testifying that he had not previously seen the affidavit, Mask stated that it was a "jailhouse prepared document" which had not been witnessed and signed by an investigator, indicating that it was not created by or for his office.   (*Id.* at 20-21).   Mask testified that, had he

---

[3] Petitioner characterizes this testimony as Mask saying that he didn't remember whether he had seen the affidavits of Currie or Robinson before preparation for the hearing.   This characterization is not accurate.   As Mask clarified on cross-examination, Mask did not recall ever having seen the affidavits of Currie and/or Robinson, and that he believed that "the first time [he] saw [these] document[s was] when the prosecutor gave [them] to [him] a couple of months" before the hearing.   (*Id.* at 67).   Mask also testified on cross that he "didn't know [the affidavits] existed" prior to his preparation for the 2015 hearing.   (*Id.* at 82).   It is therefore clear that Mask's testimony was that he had never received the affidavits prior to or during Petitioner's trial.

been provided with this affidavit before trial he would have "inquire[d] about the information on

it.  [He] wouldn't [have] ignore[d] it.  [He] would [have] tr[ied] to find out how it came to be that

this person knows about the incident."  (*Id.* at 21).  Mask testified that this reflected his normal

and habitual practice at the time of Petitioner's trial: that where a potential witness was identified,

he would have had an investigator speak to the potential witness and make a decision of whether

to call a witness after having reviewed any resulting report.  (*Id.* at 21).

The State then presented Mask with the affidavit of Currie, then known as Abdul Samee.

(*Id.* at 26).  Mask again testified that he had no recollection of ever having seen the document

prior to preparation for the 2015 hearing.  (*Id.* at 26-27).  Mask likewise again testified that

Currie's affidavit, too, was a jailhouse document, and that it had not been created by or for the

Public Defender's office.  (*Id.* at 27).  Mask then stated that, had he been provided with this

document prior to trial, he would not have ignored it, explaining that

> [t]his affidavit purports to say that he was a witness to what
> happened in the hallway [where the incident resulting in Petitioner's
> conviction occurred].  And not knowing the background of Mr.
> [Currie], I would have, of course, interviewed him to see if he would
> be a valid and useful witness at the trial of [Petitioner].  And since
> it appears that this affidavit says he has firsthand knowledge of what
> happened in the hallway, I would have considered him a useful
> witness and given the fact that he had on-site information, perhaps I
> would have decided and advised [Petitioner] that maybe he need not
> testify on his own behalf, given his history.

(*Id.* at 28).  Mask also testified that had he been given the affidavit, he would have sent his

investigators to do what they could to locate Currie and interview Currie as a potential witness.

(*Id.* at 31-32).

Regarding Petitioner, Mask testified that Petitioner was actively engaged in his defense.

(*Id.* at 32).  Mask also stated that Petitioner, during several visits and throughout several motion

5

hearings prior to trial, was provided with ample opportunity to bring up the affidavits or otherwise present them to him prior to trial.   (*Id.* at 39-40).   Mask testified that, throughout those meetings, hearings, and ultimately at trial, Mask did not remember Petitioner ever asking about Robinson or Currie, or otherwise asking why they hadn't been called.   (*Id.* at 40).

Following the conclusion of Mask's testimony, Petitioner called Currie as a witness. When asked about his affidavit, Currie testified that he recognized his signature on the document, but otherwise could not verify the details contained therein or the date on which it was signed. (*Id.* at 89-90).   Currie stated that he had been a heavy drug user during the time in which the affidavit was purportedly made, and had suffered memory loss following a coma he had been in a year prior to his testimony at the hearing.   (*Id.*).   As a result of the length of time between the affidavit's writing and the hearing, Currie's prior drug use, and Currie's coma issues, Currie stated that he could not remember "who wrote [the affidavit] or how it was written" and could only "remember vaguely that [he] was in the county jail."   (*Id.*).   Although Currie testified that, at some point during the time period while OJ Simpson was on trial, that someone, perhaps an investigator or lawyer, had tried to find and get in contact with him, he had no memory of who it was that was looking for him or for what purpose.   (*Id.* at 93-94).   When further questioned on cross examination, Currie testified that he didn't remember ever meeting with Mask or any investigator for the Public Defender's Office, instead testifying that the only time he remembered being contacted by an investigator or lawyer in relation to Petitioner's case was in the weeks leading up to the 2015 hearing.   (*Id.* at 103-04).

Petitioner next called Stan Robinson as a witness.   Robinson testified that he recognized his affidavit, and that he had signed it in the jail law library in August of 1994.   (*Id.*at 108).   On

cross examination, Robinson testified that he had been on heroin at the time of the affidavit, and that he had only known Petitioner as "Ali."   (*Id.* at 110).   Robinson testified that he only knew of Ali from "seeing him" and had never "hanged" with Petitioner.   (*Id.* at 110, 118).   While Robinson stated that he did know Petitioner from jail, he was unable to clarify during which of his stints in jail he and Petitioner had met, and admitted that the two years in prison in which they knew each other may have been at some time between 1982 and 1991 or even after trial "in the nineties."   (*Id.* at 111-16).   Likewise, while Robinson testified on cross that he never knew Petitioner "outside [of jail] on the street," on redirect he instead testified that he had known Petitioner from "around the neighborhood" while outside of jail.[4]   (*Id.* at 111, 118).   Robinson also testified that he had never met Mask or any investigator from the Public Defender's Office regarding his affidavit.   (*Id.* at 115-16).

Finally, Petitioner testified on his own behalf.   Petitioner testified that, while in the county jail, he spent most of his time in the prison library or the gym, and it was in those places that he met with Currie and Robinson, who apparently volunteered to him their knowledge of the events which gave rise to his criminal charges.   (*Id.* at 119-20).   Petitioner testified that he gave the affidavits both men wrote up to counsel at some point in the month of August, 1994.   (*Id.* at 120). Petitioner asserted that he thought both would make good witnesses at trial, but Mask refused to call them because of their criminal histories and because Mask thought the witnesses he did call at trial were better for the defense.   (*Id.* at 121).   On cross examination, Petitioner admitted to an extensive history of felony convictions.   (*Id.* at 122-24).   When asked about the delivery of the

---

[4] Robinson also denied ever using the name of his apparently deceased brother, Robert Robinson (*Id.* at 109-10), however that name does appear as an alias on the documents establishing Robinson's criminal history entered into evidence at the February 2015 evidentiary hearing.

affidavits to Mask on cross, Petitioner first stated that he provided the affidavits of two witnesses that testified at trial, Davis and Barnhill, separately to Mask in July of 1994, but then changed his testimony and stated that he gave all four affidavits to Mask at the same time in the summer of 1994. (*Id.* at 120, 135-40). Petitioner also testified that although Mask had interviewed and discussed with him calling Barnhill and Davis, that Mask had not done so in regard to Currie and Robinson. (*Id* at 134-40).

Petitioner testified that, as to Robinson and Currie, he constantly questioned Mask about whether or not they would be called and whether Mask had investigated them. (*Id.* at 140-41). Petitioner then stated that he believed that Mask never investigated them, obstinately refusing to do so because of their prior criminal records.[5] (*Id.* at 141-42). Petitioner also claimed that he and Mask had fought over Currie and Robinson, to the point that they almost came to blows over the issue. (*Id.* at 142-43). In spite of his apparent displeasure with Mask, Petitioner admitted that he had not asked the judge to relieve Mask as counsel during trial, having apparently only done so prior to trial in relation to pre-trial motions Mask would not file. (*Id.* at 143-44, 146). Petitioner claimed that he failed to raise the witness issue to the trial judge, either during jury selection or at trial including during Petitioner's colloquy on his choice to testify, because the Essex County Public Defender's Office had a policy of reprisals against defendants who complained about their representation, often permitting them to languish in jail for years prior to trial. (*Id.* at 144). Finally, Petitioner claimed that he had no recollection of ever having discussed his right to testify or not testify on his own behalf at trial, a statement which contradicts the Fifth

---

[5] This Court notes that Mask, according to Petitioner, had no such qualms regarding Barnhill and Davis, both of whom also had significant criminal histories.

Amendment colloquy conducted during Petitioner's trial.   (*Id.* at 144-46).

## II.  DISCUSSION

### A.  Legal Standard

Under 28 U.S.C. § 2254(a), the district court "shall entertain an application for a writ of habeas corpus [o]n behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."   The petitioner has the burden of establishing his entitlement to relief for each claim presented in his petition based upon the record that was before the state court.  *See Eley v. Erickson*, 712 F.3d 837, 846 (3d Cir. 2013); *see also Parker v. Matthews*, --- U.S. ---, ---,132 S. Ct. 2148, 2151 (2012).   Under the statute, as amended by the Anti-Terrorism and Effective Death Penalty Act, 28 U.S.C. § 2244 ("AEDPA"), the district courts are required to give great deference to the determinations of the state trial and appellate courts.   *See Renico v. Lett*, 559 U.S. 766, 772-73 (2010).

Where a claim has been adjudicated on the merits by the state courts, the district court shall not grant an application for a writ of habeas corpus unless the state court adjudication

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2).   Federal law is clearly established for the purposes of the statute where it is clearly expressed in "only the holdings, as opposed to the dicta" of the opinions of the

United States Supreme Court. *See Woods v. Donald*, --- U.S. ---, ---, 125 S. Ct. 1372, 1376 (2015). "When reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong." *Id.* Where a Petitioner establishes that the state court's determination was based upon an unreasonable application of federal law, a Petitioner's claims challenging those suspect determinations are reviewed *de novo*. *See Breakiron v. Horn*, 642 F.3d 126, 138 (3d Cir. 2011); *see also Panetti v. Quarterman*, 551 U.S. 930, 953 (2007). Because the Court of Appeals has previously determined that the state court's decision not to hold an evidentiary hearing was based upon an unreasonable interpretation of clearly established federal law, this Court must review Petitioner's sole remaining ineffective assistance claim *de novo*.

## B.   Analysis

### 1.   Credibility Findings

This Court makes the following findings of fact and credibility as to the testimony presented during the February 6, 2015, evidentiary hearing. This Court finds the testimony of former defense counsel Mask highly credible. Although Mask had a somewhat limited memory of this case following the passing of twenty-two years, Mask was forthright and reliable in his testimony. This Court specifically credits both Mask's testimony that he never received either of the challenged affidavits as well as his testimony that it would have been his habitual practice after many years of criminal trial experience, had he received the affidavits, to thoroughly investigate the two potential witnesses and discuss with Petitioner whether or not they should be called as

witnesses at trial.[6]   This Court also finds credible Mask's assertion that he and Petitioner never discussed these two potential witnesses.

The testimony of Petitioner, however, lacks credibility.   Petitioner's assertion that Mask refused to call Currie or Robinson based on prior criminal convictions is directly contradicted not only by Mask's credible testimony that, after many years of experience, he would not reject a witness solely on criminal history especially in cases where all of the witnesses have criminal records, but also Mask's testimony that his office did not, at that time, have direct access to any potential witness's criminal records and largely had to rely on defendants or the witnesses themselves for that information.   This Court, in finding Mask credible, also rejects Petitioner's contention that he and Mask nearly came to blows over witnesses which Mask testified he had never heard of nor discussed with Petitioner.   Combined with Petitioner's waffling as to whether he discussed his right to testify with the trial court or counsel and as to the dates on which he provided affidavits to Mask as well as Petitioner's demeanor during his testimony, this Court finds Petitioner's testimony lacking in credibility.

As to the remaining witnesses, Currie and Robinson, this Court finds their testimony unavailing for Petitioner and equally lacking in credibility.   Currie directly testified that he had no knowledge of the affidavit other than to say that the signature on it was his and directly stated that he could neither confirm nor deny its contents as years of drug use and other health issues had

---

[6] Contrary to Petitioner's assertion otherwise, such evidence of Mask's habitual performance of his duties is admissible to prove that Mask acted in conformity with that habit during his representation of Petitioner.   *See, e.g., Carrion v. Smith*, 549 F.3d 583, 590 (2d Cir. 2008) ("habit evidence [is] used 'to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit of routine practice,' Fed. R. Evid. 406, and courts have relied on such evidence in habeas corpus proceedings to find effective assistance of counsel").

left him with a poor memory of the time period in question.   Although the Court accepts Currie's assertions of memory loss, those assertions render his testimony of little, if any, value to Petitioner. Robinson's testimony was internally inconsistent in so much as Robinson wavered as to when, how, and how well he knew Petitioner and as to when they were in prison together, stating that it could have been long before, immediately prior to, or even after trial in this case.   As such, this Court finds Robinson's testimony entirely lacking in credibility.   Having addressed the credibility of the witnesses during the hearing, this Court will now address Petitioner's ineffective assistance of counsel claim.

**2.   Petitioner's Ineffective Assistance Claim**

This matter is before this Court on a single issue: whether Petitioner's trial counsel was constitutionally ineffective under *Strickland v. Washington*, 466 U.S. 668 (1984), for failing to call Currie and Robinson as witnesses in Petitioner's criminal trial.   To succeed on an ineffective assistance of counsel claim, Petitioner must show that "counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the counsel guaranteed by the Sixth Amendment."   *Id.* at 687*; see also United States v. Shedrick*, 493 F.3d 292, 299 (3d Cir. 2007).   The "proper standard for attorney performance is that of 'reasonably effective assistance.'"   *Jacobs v. Horn*, 395 F.3d 92, 102 (3d Cir. 2005).   Thus, to show constitutional deficiency, Petitioner must show that counsel's representation "fell below an objective standard of reasonableness" considering all the circumstances.   *Id.*   Reasonableness in this context must be determined based "on the facts of the particular case, viewed as of the time of counsel's conduct."   *Id.*   Courts scrutinizing the performance of counsel "must be highly

deferential . . . a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

Where a petitioner challenges counsel's decision as to which witnesses to call, the courts are "required not simply to give [the] attorney[] the benefit of the doubt, but to affirmatively entertain the range of possible reasons [petitioner's] counsel may have had for proceeding as [he] did." *Branch v. Sweeney*, 758 F.3d 226, 234 (3d Cir. 2014) (quoting *Cullen v. Pinholster*, --- U.S. ---, ---, 131 S. Ct. 1388, 1407 (2011)).   Even if a petitioner establishes that counsel's representation fell below an objective standard of reasonableness, a petitioner must also show that counsel's failings prejudiced his defense.   *Id.* at 692-93.   "[F]ailure to satisfy either prong defeats an ineffective assistance [of counsel] claim."   *United States v. Cross*, 308 F.3d 308, 315 (3d Cir. 2002).

As the Court of Appeals has already determined that Petitioner suffered prejudice as a result of the failure to call Currie and Robinson as witnesses at trial, this Court is called upon only to determine whether counsel's failure to call those witnesses was the result of ineffective assistance.   Here, this Court finds credible and accepts Mask's assertion that Petitioner never gave him the affidavits of Currie and Robinson, and rejects Petitioner's assertion to the contrary.   Mask failed to call these two witnesses not out of trial strategy or because of some disagreement over their criminal histories, but instead because Petitioner never brought the existence of these two witnesses to Mask's attention, and their names appeared nowhere in the police reports counsel received.   As Petitioner never provided their affidavits to Mask, counsel could not be expected to divine the existence of potentially exculpatory testimony out of the ether, and he was therefore not deficient for failing to locate and call as witnesses persons unknown to him.   As such, this Court

finds that Petitioner's trial counsel's performance was not constitutionally defective and that Petitioner's ineffective assistance of counsel claim must fail as a result.   *Jacobs*, 395 F.3d at 102.


## III.   CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. §2253(c), Petitioner may not appeal from a final order in a habeas proceeding where Petitioner's detention arises out of a state court proceeding unless Petitioner has "made a substantial showing of the denial of a constitutional right."   "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude that the issues presented here are adequate to deserve encouragement to proceed further."   *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). As Petitioner has failed to show that his trial counsel was constitutionally ineffective and jurists of reason could not disagree with the Court's findings to that effect, no certificate of appealability shall issue.


## IV. CONCLUSION

For the reasons stated above, Petitioner's petition for a writ of habeas corpus is DENIED, and no certificate of appealability shall issue.   An appropriate order follows.


June 4, 2015                                       __*s/ Susan D. Wigenton*_____
                                                  SUSAN D. WIGENTON
                                                  U.S.D.J.